UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ANNE FRANCISCO, *et.al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 4:17CV1455 HEA |
| | ) | |
| CORIZON HEALTH, INC., *et al*, | ) | |
| | ) | |
| Defendants, | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendants Griffin and Rhodes' Motion
to Dismiss, [Doc. No. 6] and Defendant Villmer's Motion to Dismiss, [Doc. No.
18]. Plaintiff opposes the Motions. For the reasons set forth below, the Motions
are denied.

### Facts and Background[1]

Plaintiffs' Complaint alleges the following:

Thomas Villmer was at all relevant times the Warden of the Farmington

Correctional Center in which Joshua Francisco was incarcerated. Defendant was at

---

[1] For purposes of deciding a motion to dismiss for failure to state a claim, a court accepts the
factual allegations contained in the complaint as true. *Eckert v. Titan Tire Corp.* 514 F.3d 801,
806 (8th Cir. 2008).
   The recitation of the facts is taken from Plaintiff's Amended Complaint and is set forth for the
purposes of this motion only. It in no way relieves the parties of the necessary proof of the facts
in later proceedings.

all relevant times the chief policy maker of the Farmington Correctional Center in which Joshua Francisco was incarcerated. No later than October 7, 2014, Defendant Villmer received notice at a forced medication hearing for Joshua Francisco that he was suicidal and that staff recommended moving Francisco to the Social Rehabilitation Unit (SRU).

Defendant Gregory Rhodes was at all relevant times the Functional Unit Manager (FUM), responsible for supervision of the area of the Farmington Correctional Center in which Joshua Francisco was incarcerated. Defendant had notice that Joshua Francisco was suicidal prior to the completed suicide.

Defendant Michael Griffin was at all relevant times a correctional officer in the area of the Farmington Correctional Center in which Joshua Francisco was incarcerated. Defendant had notice that Joshua Francisco was suicidal prior to the completed suicide.

At all relevant times Defendants, and each of them, acted under color of law, in the performance of official duties, by virtue of their authority as employees or agents of the Missouri Department of Corrections, and are sued in their individual capacities.

At all relevant times, Defendants conduct was not objectively reasonable in that Defendants knew or should have known that each were violating and did violate Joshua Francisco's clearly established constitutional rights

On January 10, 2011, Allison Francisco, Joshua Francisco's wife at the time, obtained a Judgment for a full Order of Protection that did not permit Joshua Francisco to abuse, stalk, molest, or communicate with Allison Francisco, Case no. 10SL-PN03967.

On May 16, 2011, Joshua Francisco plead guilty to three counts of misdemeanor violations of an Order of Protection, and was given a 12 month sentence, suspended execution. Case no. 10SL-CR09074.

On May 16, 2011, Joshua Francisco plead guilty to three felony counts of aggravated stalking, by parking outside his then wife's residence, had another person call his wife two times, sent her three emails, confronted her at a nail salon, and tried to call her collect. He was given a three-year sentence, suspended execution. He also plead guilty to two counts of misdemeanor violations of the Order of Protection, and was given two years supervised probation. Case no. 10SL-CR09509.01.

On February 29, 2012, a Judgment dissolving the marriage of Joshua and Allison Francisco was granted. Allison was given sole custody of their child A. F., Joshua was granted supervised visitation, and Joshua was ordered to pay child support.

On March 2013, Joshua Francisco was arrested and detained in the St. Louis County Jail. He was transferred to the Metropolitan Psychiatric Center (MPC).

In June 2013, while at MPC, Joshua Francisco attempted to call his ex-wife from the hospital telephone because he thought he was going to die and wanted to talk to his daughter.

On or about June 26, 2014, the St. Louis County Circuit Court revoked Joshua Francisco's probation and sentenced him to three years in prison, Case no. 10SL-CR09509-01, and he plead guilty to one count of aggravated stalking, Case no. 13SL-CR05959-01.

On July 2, 2014, Joshua Francisco was received in the Eastern Diagnostic, Reception and Correctional Center (ERDCC) "on high suicide risk" intervention status from the St. Louis County jail. St. Louis County reported that Francisco had "schizophrenia (rule out), anxiety, bipolar affective disorder (rule out), … psychosis, … suicidal intent" and that he was on Risperidone, an anti-psychotic, and benzotropine mesylate for tremors. The intake at ERDCC noted that Francisco had a previous suicide attempt. A Suicide Intervention Report stated that a suicide smock was allowed for Francisco.

On July 2, 2014, Dr. Lindsey, a psychologist at ERDCC, placed Joshua Francisco on suicide watch and he was prescribed Zyprexa, an anti-psychotic medication. On or about July 7, 2014, Joshua Francisco was removed from suicide watch.

On July 22, 2014, Joshua Francisco was transferred to the Farmington Correctional Center.

On July 30, 2014, a Qualified Mental Health Professional (QMHP) conducted an initial evaluation of Francisco in segregation. Joshua told her about his suicide attempt in 2011. It was noted from previous records that Joshua had stated that he was a "visionary of God, that he was Jesus and that the doctors and the government are trying to control his mind."

On July 31, 2014, Joshua Francisco was examined by Dr. Moses Ambilichu who noted paranoia and diagnosed schizoaffective disorder, bipolar type. Dr. Ambilichu considered administering involuntary medications.

On August 12, 2014, Joshua Francisco was evaluated by Dr. Rajendra Gupta. Francisco stated "I want somebody to put me to sleep. I am miserable." Dr. Gupta prescribed Perphenizine (an anti-psychotic), Trilafon (for schizophrenia) and Benztropine (tremors).

On August 22, 2014, custody staff reported to a QMHP that Francisco was in front of a medical unit walking around in circles saying he was going to die. He was placed on suicide watch status with a suicide smock.

On August 26, 2014, Dr. Marion McIntyre released Francisco from suicide watch to be returned to his assigned housing unit.

On August 27, 2014, QMHP Copp (Hahn) noted Francisco believed he had a blood disease from being injected with medications, became agitated and said "I'm f**** sick!" He asked to be euthanized stating that it was "better than this hell hole." He said his health was destroyed, that she might as well let him sleep.

On August 28, 2014, Francisco was again placed on suicide watch with a suicide smock. He was seen by Chris Rydeen who noted Francisco told his cellmate that he was going to jump off of the top walk in the housing unit.

On August 29, 2014, Francisco admitted to Dr. McIntyre that he had been asking if jumping off the top walk would be lethal. Francisco believed that he had been poisoned and admitted to thinking about self-harm the night before. He was continued on suicide watch status.

On August 30, 2014, Francisco told Dr. McIntyre that he was miserable and thinking about self-harm.

On September 3, 2014, Dr. McIntyre removed Francisco from suicide watch status because she said he had no thoughts of self-harm for 24 hours. Later that day Francisco was again placed on suicide watch by Dr. Ambilichu for cutting himself with a broken light bulb. He was assessed as severely psychotic, had delusional thoughts and was not in touch with reality. He stated that he deserved to die. It was noted he had not been eating or sleeping. Suicidal ideations were noted. Dr.

Ambilichu said that he would pursue an involuntary medication hearing for injections of Haldol. Francisco was placed in a suicide smock.

On September 5, 2014, Dr. McIntyre noted Francisco said he wanted to die and his life is in shambles. He refused to take medication.

On September 6, 2014, Dr. McIntyre noted Francisco said he is dealing with a disaster, his life. He wished he was dead and wanted to be euthanized.

On September 10, 2014, Lisa Sanderson noted Francisco said he wanted to end his life and that he deserved to die.

On September 16, 2014, Dr. McIntyre noted Francisco refused to take a mattress because of bacteria and said he felt like there was "crap" coming out of his pores. Dr. McIntyre requested that Francisco shower. An Involuntary medication hearing was held and Francisco was placed on involuntary medication status.

On September 19, 2014, Dr. McIntyre released Francisco from suicide watch.

On September 24, 2014, QMHP Hahn completed an SRU referral for Francisco.

On September 25, 2014, Dr. Gupta prescribed Cogentin for Francisco's side effects and continued Haldol. Francisco told persons in the visiting room that Haldol was making him miserable and asked to be put out of his misery. He was

returned to Housing Unit 9. Lisa Sanderson placed Francisco on suicide watch because he said he wished he was dead. Francisco was given a Conduct Violation because he had spit blood on the cell walls.

On September 29, 2014, Dr. McIntyre removed Francisco from suicide watch status.

On October 7, 2014, at a forced medication hearing, CCM I Kimberly Scallion told prison warden Villmer and Chief of Mental Health Services Lisa Sanderson that Francisco would be a good candidate for the SRU program.

On October 8, 2014, Dr. Ambilichu increased Francisco's Haldol injections to 100 mg IM q 4 weeks with Benadryl as he was "still psychotic" and Cogentin PO to 1mg HS. It was noted that Francisco's SRU referral was approved and his mental health score was raised to a 4.

On October 10, 2014, QMHP Tech Ashley Hahn denied Francisco's request to see a psychiatrist about his medication.

On October 16, 2014, Francisco again requested to see the psychiatrist about medications.

On October 16, 2014, the Administrative Segregation Committee released Francisco from segregation in the "suicide cell" in Housing Unit 5, C-wing, but he refused to leave, saying he was sick and suicidal. Francisco was given another Conduct Violation. Francisco was accepted in but had yet to be admitted to the

SRU in Housing Unit 9 because the earliest a psychiatrist could see him was October 27, 2014. Francisco was then placed in Housing Unit 5 D-wing. CO 1 Sheldon Taylor expressed concerns to mental health staff Lisa Sanderson, Justin Ream, and Dr. McIntyre whether Francisco was ready to be removed from suicide watch since Francisco still appeared scared and paranoid.

On October 17, 2014, Dr. Gupta noted Francisco felt dizzy, was sweating, felt like "crap," thought he had a blood disease, and had anxiety. He was started on Buspar 15 milligrams for anxiety at bed time. The assessment was mood disorder with psychosis and depression with psychosis.

On October 20, 21, and 22, 2014, Offender Christopher Earnest, Joshua Francisco's cellmate, told CCMI Scallion, that Francisco was talking about suicide, killing himself, and that he needed help. CCMI Scallion asked Francisco and he denied wanting to hurt himself. CCMI Scallion told FUM Gregory Rhodes this information. They decided not to place Francisco in C-wing because Francisco would not say he was going to harm himself. CCMI Scallion believed that an offender had to verbalize he was suicidal before placing him on suicide watch. CCMI Scallion did not make a mental health referral for Francisco, even though it was usual to do so under these circumstances.

FUM Rhodes was told by CCMI Scallion that Francisco's cellmate Earnest was saying that a noose was found in Francisco's cell.

Offender Derek Bruce, housed in the cell adjacent to Francisco's cell, told an investigator that on or about October 21, 2014, he told COI Michael Griffin that Francisco said he was going to hang himself. Offender Bruce also told the investigator that he informed CCMI Scallion that Francisco was going to hurt himself.

On October 21, 2014, COI Michael Griffin was informed by both offender Christopher Earnest and offender Derek Bruce that Francisco was suicidal. COI Griffin knew that Francisco had been on suicide watch and close observation several times in the past. COI Griffin asked Francisco, who denied being suicidal. COI Griffin believed he could not put an offender on suicide watch unless the offender stated he was suicidal.

On October 22, 2014, Francisco was given 10 days in disciplinary segregation for refusing to leave HU5 on October 16, 2014. Francisco was not eligible to return to HU 9 due to the pending conduct violation.

Offender Earnest told an investigator that on or about October 22, 2014, he told a Correctional Officer and a Sergeant that Francisco was talking about suicide, killing himself, and that he needed help. Offender Bruce told an investigator that he heard Francisco crying when he was speaking with the Sergeant.

On October 22, 2014, at about 11:15 a.m., COI Joseph Gooch, heard three or four offenders screaming that an offender in SD-12 "was going to kill himself."

Offender Earnest, told CO Gooch that Francisco was going to kill himself. In response CO Gooch restrained Offender Earnest to prepare to remove Francisco from the cell.

COI Michael Griffin told COI Gooch that Francisco never said the "magic words," that he was going to kill himself, to the correctional officers, and the officers did not have to remove Francisco from the cell.

COI Darren Cook yelled over the intercom system that he did not want to open the cells for a door count at that time.

COII Sergeant Jason England came to the cell and observed Francisco crying and upset. COI Gooch told COII England that Francisco needed to be removed from the cell. Offender Earnest told England that Francisco was suicidal. COI Griffin told England that Francisco had been suicidal in the past. Francisco wanted to speak with England but England told him he could not at that time. COII England decided not to remove Francisco from the cell because Francisco denied wanting to harm himself.

After COII England left Francisco, COII England met with FUM Greg Rhodes, who told England that Francisco was frequently on suicide watch and that England should keep watch on Francisco.

Offender Earnest told an investigator that on October 22, 2014, at around 8:00 p.m., recreation time began and he left their cell but Joshua Francisco

remained therein. Offender Earnest told an investigator that on October 22, 2014, when he returned to the cell, he found Joshua Francisco hanging from the light fixture. He reported this to COI Jeremy Jaco.

On October 22, 2014, at about 9:15 p.m., COI Jaco and COI Joseph Gilliam cut Francisco down, started CPR, and called a code. Nurse Felicia Giudicy responded and found Francisco lying on floor with no pulse. The AED was attempted but failed to administer an appropriate shock. The AED kept saying "check battery." Joshua Francisco was pronounced dead at 9:43 p.m.

FUM Rhodes was uncertain whether an inmate should be put on suicide watch if the inmate did not verbalize a suicidal intent but their actions warranted it. FUM Rhodes stated the failure to make a mental health referral for Francisco did not follow prison protocols.

Chief of Mental Health Services Lisa Sanderson stated that Francisco was "very, very mentally ill," "had some of the worse delusions I've seen in a long time," and "would routinely ask staff 'please kill me, please put me out of my misery, please euthanize me.'" She had seen only one other offender like Francisco and that other offender was in a Correctional Treatment Center (CTS) for a long time. However, Sanderson never recommended Francisco for the CTS.

FUM Rhodes, COI Griffin, CCMI Scallion, and COII England were found by prison officials to have violated Suicide Intervention Procedure no. 12-4.1 for

failing to initiate Suicide Intervention Reports after being made aware of Francisco's behavior and that Francisco was suicidal.

Joshua Francisco had serious medical needs arising from his diagnoses by medical professionals of paranoia, schizoaffective disorder-bipolar type, psychosis, delusional thoughts, and suicidal ideations, eventually requiring the involuntary administration of medications and for him frequently to be under suicide watch, and it was so obvious that even lay persons working in the prison including, but not limited to, Defendants Rhodes, England, Scallion, and Griffin would easily recognize the necessity for a medical or psychological professional's attention in October 2014.

The behavior, actions and statements of Joshua Francisco, from his own mouth and from the mouth of others, provided actual knowledge to Defendants of a substantial risk that Joshua Francisco was harmful to himself and was suicidal as a result of his serious mental and psychological disorder.

Despite such actual knowledge, Defendants Rhodes, England, Scallion, and Griffin disregarded the substantial risk that Joshua Francisco was harmful to himself and was suicidal by intentionally refusing or intentionally failing to take reasonable measures to deal with the problem including, necessary observation, mental health referral, removing from a regular cell and placing in a suicide-proof cell, and/or placing him on suicide watch on October 20, 21, and 22, 2014.

Despite such actual knowledge, Defendant Villmer and Defendants Corizon, Sanderson, Ambilichu, McIntyre, and/or Gupta disregarded the substantial risk that Joshua Francisco was harmful to himself and was suicidal by intentionally refusing or intentionally failing to take reasonable measures to deal with the problem including, but not limited to, ordering necessary observation, placing Francisco in the SRU, and/or sending Francisco to a proper medical facility or CTS for psychological care and treatment prior to October 20, 21, and 22, 2014.

Defendants' acts and omissions constituted a course of detainee suicide risk observation, recognition, intervention, and prevention so clearly inadequate as to amount to refusal to provide essential medical and psychological care to Joshua Francisco.

Defendants' acts and omissions were so blatantly inappropriate as to show evidence of deliberate indifference, intentional maltreatment and/or intentional refusal to provide appropriate observation, referrals, and/or treatment of Joshua Francisco.

Defendants thereby violated Joshua Francisco's rights to due process and equal protection of the laws under the Fifth and Fourteenth Amendments to the United States Constitution.

Defendants' failure to provide necessary medical and psychological care and observation to Joshua Francisco constituted cruel and unusual punishment of

Joshua Francisco in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

The above actions of each of the Defendants, and their agents and/or employees, acting under color of their authority as employees and/or agents of the Missouri Department of Corrections, directly caused or contributed to cause Joshua Francisco's mental and psychological disorder to become more serious to the point that he attempted suicide and succeeded because of Defendants' failure to employ proper suicide risk observation, recognition, intervention, and prevention for Joshua Francisco, and Defendants' failure to properly request treatment of or treat Joshua Francisco with medicines, therapy, referral to the SRU, CTS or other outside healthcare facility, and/or eliminating the means to hang himself.

Defendants Rhodes and/or Does 1-10 are liable for the unconstitutional actions of Defendants Scallion, England, and Griffin due to the failure of Defendants Rhodes and/or Does 1-10 to supervise Defendants Scallion, England, and Griffin so as not to deprive inmates and detainees of their constitutional rights.

As a result of the failure of Defendants Rhodes and/or Does 1-10 to properly supervise prison employees, Defendants Scallion, England, and Griffin falsely believed that an inmate had to state to a correctional officer or other prison employee or agent that the inmate was suicidal before they could make a mental health referral or seek appropriate other treatment for the inmate.

Defendants Rhodes and/or Does 1-10 failure to provide adequate supervision to its agents and/or employees on the constitutional requirement to provide adequate and necessary medical and psychological care and observation to prisoners represents a deliberate indifference to the rights of persons with whom Defendants Scallion, England, and Griffin come into contact.

Defendants Rhodes and/or Does 1-10 knew that their agents and/or employees will be called upon to assess, observe, treat, and/or recommend for treatment prisoners with severe mental and psychological disorders.

Defendants Rhodes and/or Does 1-10 knew that their agents and/or employees, including defendants England, Scallion and Griffin, failed to provide adequate and necessary medical and psychological care and observation to prisoners including, but not limited to, Francisco, who had expressed suicidal ideations, and condoned such failure.

Despite such knowledge, Defendants Rhodes and/or Does 1-10 failed to take sufficient remedial action by informing the employees and/or agents, including Defendants Scallion, England, and Griffin, that an inmate did not have to state the "magic words" himself before suicide intervention measures were taken. If Defendants Rhodes and/or Does 1-10 had provided adequate and proper supervision to Defendants Scallion, England, and Griffin, those Defendants would have provided Joshua Francisco with adequate and necessary medical and

psychological care and observation while he was incarcerated at the Farmington Correctional Center, and Francisco's constitutional rights would not have been violated.

The actions of Defendants Rhodes, Scallion, England, Griffin, Sanderson, Ambilichu, McIntyre, and Gupta, and each of them, were performed pursuant to a custom, policy, or practice formulated by Defendants Villmer and/or Does 21-30 and/or Corizon, and followed by Defendants Rhodes, Scallion, England, Griffin, Sanderson, Ambilichu, McIntyre, and Gupta, under which Defendants regularly failed to provide adequate and necessary inmate observation, psychological referrals, psychological care which has directly caused or contributed to cause death and/or serious injury to inmates.

As a result of the custom, practice or policy of Defendants Villmer and/or Does 21-30 and/or Corizon, Defendants Rhodes, Scallion, England, Griffin, and Sanderson falsely believed that an inmate had to state to a correctional officer or other prison employee or agent that the inmate was suicidal before they could make a mental health referral or seek appropriate other treatment for the inmate. 103. The custom, policy, or practice formulated by Defendants Villmer and/or Does 21-30 and/or Corizon, acting under color of their authority as employees and/or agents of the Missouri Department of Corrections, directly caused or contributed to cause Joshua Francisco's mental and psychological disorder to

become more serious to the point that he attempted suicide and succeeded because of Defendants' failure to employ proper observation of Joshua Francisco, and Defendants' failure to properly treat Joshua Francisco with medicines, therapy, reference to an outside healthcare facility, and/or eliminating the means to hang himself.

Defendants have moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss Plaintiffs' Complaint for failure to state a claim.

## Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint. The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002)); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations."); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (stating that a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim. *Scheuer*, 416 U.S. at 236. A viable complaint must include "enough facts to state a

claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A complaint

is plausible if its "factual content allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Braden v. Wal–Mart*

*Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). A

complaint that offers labels, bare assertions, and "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements," is

insufficient to avoid dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss under 12(b)(6), a complaint must contain

sufficient factual matter, accepted as true, to state a claim for relief that is plausible

on its face. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). Determining whether a complaint states a

plausible claim for relief will ... be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense. *Id*. at 1950.

### Discussion

To state a claim under 42 U.S.C. § 1983, a plaintiff must show that a person

acting under color of state law deprived him "of rights, privileges, or immunities

secured by the Constitution." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

Plaintiffs allege that Defendants were acting under color of state law. Therefore,

the threshold inquiry is whether Defendants violated rights secured by the

Constitution.

**Defendants Rhodes and Griffin**

Defendants Rhodes and Griffin argue that Count I fails to set forth sufficient allegations to describe the conduct of these Defendants that allegedly violated the Fifth and Fourteenth Amendments. To the contrary, the Complaint, incorporating all of the factual allegations set out, alleges that Rhodes and Griffin knew Francisco was suicidal and failed to take action to avoid the risk of self-harm. Plaintiffs allege that Rhodes was responsible for supervision in the area where Francisco was incarcerated, and that he had notice that Francisco was suicidal prior to his actual suicide. Plaintiffs identify Griffin as a correctional officer in the area in which Francisco was incarcerated and had notice that he was suicidal prior to his actual suicide.

More specifically, Plaintiffs allege that Rhodes learned of Francisco's words, actions and behavior prior to the suicide. He also learned that a noose was found in Francisco's cell. Further alleged are the allegations that Rhodes decided not to place Francisco in C-wing because Francisco himself did not say he was suicidal. He did not make a suicide referral and he did not know whether an inmate should be put on suicide watch if the inmate did not verbalize a suicidal intent.

With respect to Defendant Griffin, Plaintiffs allege that he was told by Francisco's cellmate and an inmate in the adjacent cell that Francisco was going to hang himself. Griffin knew Francisco was on suicide watch several times in the

past. Griffin told others that Francisco did not need to be moved because he believed he had to hear from Francisco himself that he was suicidal.

Plaintiffs allege that these actions establish that Rhodes and Griffin had actual knowledge of Francisco's serious medical needs and that they should have recognized the need for a medical or psychological professional's attention. Despite this knowledge, Rhodes and Griffin disregarded the substantial risk that Francisco would harm himself and was suicidal.

To state a claim for failure to train or supervise, Plaintiffs must allege that (1) training or supervisory practices were inadequate; (2) Defendant was deliberately indifferent to the rights of others in adopting them, such that the failure reflects a deliberate or conscious choice by it; and (3) an alleged deficiency in training or supervisory procedures actually caused Plaintiff's injury. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (quotation and citation omitted).

Defendant Rhodes argues that Plaintiffs are attempting to hold him liable based on a theory of *respondeat superior*. Plaintiffs do not merely challenge Rhodes based on his supervisory position; rather, Plaintiffs allege that Rhodes knew that agents and/or employees failed to provide adequate and necessary medical and psychological care and observation to Francisco, who had expressed suicidal ideations and condoned such failure. Plaintiffs also allege that Rhodes failed to take sufficient remedial action by informing employees that an inmate did

not have to verbalize suicidal ideations before suicide intervention measure were taken.

**Defendant Villmer**

Defendant Villmer argues that Plaintiffs are attempting to hold him liable based on a theory of *respondeat superior*. Plaintiffs do not merely challenge Villmer's actions based on his supervisory position; rather, Plaintiffs allege that he had actual knowledge of the substantial risk that Francisco was harmful to himself and was suicidal as a result of his serious mental and psychological disorder. Plaintiffs further allege that Villmer intentionally refused or intentionally failed to take reasonable measures to deal with the problem, including ordering necessary observation, placing Francisco in the SRU and/or sending Francisco to a proper medical facility or CTS for psychological care and treatment.

**Claims as to Rhodes, Griffin, and Villmer**

Defendants' argument that Plaintiffs have failed to specify which Defendant took what action is unpersuasive. Although Plaintiffs utilize an "and/or" method of pleading, the factual allegations against defendants are clear enough for Defendants to ascertain what Plaintiffs are claiming violated Francisco's constitutional right so that they may formulate their responses to the allegations.

**Conclusion**

Because Plaintiffs allegations set out sufficient facts to notify Defendants of the claims against them, Defendants' Motions to dismiss will be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Griffin and Rhodes' Motion to Dismiss, [Doc. No. 6], is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Villmer's Motion to Dismiss, [Doc. No. 18], is **DENIED**.

Dated this 22nd day of March, 2018.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE