UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ANNE FRANCISCO, et al., | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Case No. 4:17CV1455 HEA |
| | ) |
| CORIZON HEALTH, INC., et al., | ) |
| | ) |
| **Defendants.** | ) |

### OPINION, MEMORANDUM AND ORDER

The Defendants Rhodes, England, Griffin, and Scallion's have filed their Motion for Summary Judgment [Doc. No. 98]. The Plaintiffs have filed their response in opposition. The Court has considered the filings and all applicable law. For the reasons set forth below, the Motion will be granted.

### Background

On May 6, 2017, Plaintiffs filed this action pursuant to 42 U.S.C. §1983 alleging violations of the Eighth Amendment. The Plaintiffs assert claims that Defendants were deliberately indifferent to Plaintiffs' decedent, Joshua Francisco in violation of Joshua's Eighth Amendment right to be free from cruel and unusual punishment. The claims against the moving Defendants are brought against them in their individual capacities.

## Summary Judgment Standard

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the non-moving party, indicates that no genuine [dispute] of material fact exists and that the moving party is entitled to judgment as a matter of law." *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 654 (8th Cir. 2007); Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id*. "The basic inquiry is whether it is so one-sided that one party must prevail as a matter of law." *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (internal quotation marks and citation omitted). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citation omitted). Once the moving party has met its burden, "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts and must come forward with specific facts showing that there is a genuine issue for trial." *Id*. (internal quotation marks and citation omitted).

To survive a motion for summary judgment, the "nonmoving party must

'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'" *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003) (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)). The nonmoving party may not merely point to unsupported self-serving allegations but must substantiate allegations with sufficient probative evidence that would permit a finding in his or her favor. *Wilson,* 62 F.3d 237, 241 (8th Cir. 1995). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson,* 477 U.S. 242 at 252; *Davidson & Associates v. Jung,* 422 F.3d 630, 638 (8th Cir. 2005). "Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Foundation v. Gaines,* 2008 WL 2609197 at *3 (8th Cir. 2008).

## Facts and Background

Joshua David Francisco ("Francisco") committed suicide on October 22, 2014 while incarcerateat Farmington Correctional Center.

Corizon is the contracted medical provider responsible for providing medical care and treatment to the MDOC inmates. Corizon employed qualified mental health professionals (QMHP) at FCC. The QMHPs carried a caseload of mental

3

health chronic care clients. The offenders' mental health issues were assessed and treated and the QMHPs also conducted weekly group meetings and did the rounds once a week in the segregation unit.

On October 21, 2014, the day before Mr. Francisco committed suicide, he denied to mental health staff that he was having any mental health concerns or complaints and was deemed by mental health staff to be functioning adequately. On October 21 in the morning, Dr. McIntyre did an Ad Seg "round" which was a couple of minutes at the cell door. She did not assess Joshua's willingness to go to SRU. The complete note states: "Offender denied any mental health concerns or complaints at this time. Appears to be functioning adequately in segregation."

Ms. Skaggs had an appointment scheduled with Francisco for 3 days later, on October 24, 2014.

On October 22, 2014, Jason England was working as a sergeant at Farmington Correctional Center. On October 22, 2014, England worked from 7:30 a.m. to 3:30 p.m. As a sergeant, his duties in housing unit 5 were to "[m]aintain safety and security for all offenders as well as staff." England had contact with Mr. Francisco only on October 22, 2014. England went to the cell to talk to Francisco because there was a report that Francisco's cellmate had said Francisco was suicidal. England went to Francisco's cell door and Francisco said he was worried that England was going to take the cellmate's word that he (Francisco) was suicidal

4

and put Francisco on suicide watch. Francisco told England that he was not suicidal and that he had no reason to kill himself and that he was okay. England admitted he could see Joshua "had been crying a little bit ...," had "a sad look ... worried ...," and heard Joshua's voice "breaking up ... he was very upset ... I did see a tear in his eye. He was tearing up ..." England admitted the cellmate told England a string had been found in the cell by a prior shift of officers. England had Francisco and his cellmate restrained behind their backs with handcuffs by other officers so that a cell search could be conducted. Other officers brought Francisco and his cellmate out of the cell and searched the cell.

Sometimes inmates will make up things to try to get the other offender out of the cell. Francisco and his cellmate were also strip searched, their clothes were checked and nothing was found. The officers conducting the search "could not find any string, any noose, anything to back up the cellmate's story that Francisco was suicidal. While Francisco was standing outside the cell, England spoke with him for about five minutes. England described Francisco's demeanor as just normal as could be. Francisco told England four of five times that he was not suicidal and England believed that he was fine, so Francisco was placed back in the cell.

England testified that if Francisco had said he was suicidal or led England to believe he was suicidal, he would have placed Francisco in a suicide cell. England received no training by Corizon instructing him that if the cellmate of an offender

5

said the offender was suicidal, that he should take the word of the cellmate and put the offender on suicide watch.

In 2014, Correctional Officer I Griffin worked in the Administrative Segregation unit, C Wing, as a wing officer. Griffin's duties included making walks twice an hour to check on the well-being of the offenders in the C wing.

Corrections Officer I Joseph Gooch was responsible for the offenders in the D wing where Francisco was housed. On October 22, 2014, Griffin was in Sergeant England's office preparing paperwork for the 11:15 a.m. custody count when the sergeant received a call from officer Gooch. Sergeant England left the office to go to D wing. Griffin went over to D wing too because when an officer calls for a sergeant, it may indicate there is a problem and the sergeant may need assistance. When Griffin arrived, he saw England speaking with Francisco at the cell door. Griffin heard Francisco's cellmate say that he wanted Francisco out of the cell because "he's driving me nuts and he's suicidal." Griffin spoke with Francisco, and he asked him if he was suicidal. Francisco denied being suicidal, so Griffin did not place him on suicide watch.  Griffin recalled that Francisco was aggravated because Francisco had been asked more than once whether he was having any thought of self-harm.  "If Francisco had given any indication that he was having thought of self-harm, he would have been placed on watch immediately."

6

On October 22, 2014, Griffin did not see Francisco crying and did not see unusual behavior by Francisco. With regard to training, in a situation where an inmate says his cellmate is suicidal, Griffin understood his training to require him to not take the cellmate's word but to talk directly with the offender and to ask the offender whether he was suicidal. Griffin recalled that Corizon provides follow-up training after the original training and it was his understanding of that training that if an inmate's cellmate said the inmate was suicidal, that alone was not sufficient to place the inmate on suicide watch. The inmate needed to exhibit signs of being suicidal.

Kim Scallion was the Correctional Case Manager II ("CCM") with FCC. As a CCM, Scallion made rounds at least once a day and spoke to each offender to see if they needed anything. In 2014, Scallion worked from 7:00 a.m. to 3:30 p.m.

Mental Health staff made their rounds in Administrative Segregation at least once a week. As a CCM, Scallion could not perform mental health evaluations.

On October 22, 2014, Francisco's cellmate Earnest told Scallion that Francisco was suicidal. In response, Scallion went to speak with Francisco. Francisco promised her that he was not going to hurt himself. Cellmate Earnest did not say anything when Francisco told Scallion "I'll be fine." Francisco never said to Scallion that he was going to harm himself and he did not show any signs that

7

his mood had changed drastically. In the time that Scallion had seen Francisco at FCC, she observed gradual improvements in Francisco's behavior. The only time she saw agitation was the day he did not want to go to 9-house (SRU). Scallion recalled that Francisco told her he did not want to go the SRU unit. He told her the reason that he did not want to go to SRU was because he didn't feel secure on his medication.

Scallion understood her role as a CCM was to ask the offender if he is suicidal and to look for signs of suicidal behavior. She first testified: "Q. ... based on your understanding of the policies and your training did you believe it was your role as a correctional case manager to determine whether or not somebody should go on suicide watch? A. No." She also testified: "Q. So it was your role as a correctional case manager you believed based on your training and the policies you understood to make an investigation? A. Not really"

Francisco could have requested a Medical Services Request (MSR) every night during medications pass to request to be seen by mental health staff.

Scallion recalled that Francisco's cellmate Earnest said something about a noose being found. Scallion never saw a noose or anything that looked like a noose taken from the cell that Earnest and Francisco were in. Scallion's Supervisor Functional Unit Manager Greg Rhodes reviewed the video of the cell search and saw that nothing was found that resembled a noose. Scallion and Rhodes decided

8

not to remove Francisco from the cell because by policy he did not say he was going to harm himself. Scallion knew that offenders will say things that are not true about their cellmates to get their current cellmate moved out of the cell.

Scallion believed that Francisco's cellmate Earnest was being manipulative when he said Francisco was suicidal. Scallion believed that there was not a threat of suicide because Francisco denied it. Scallion's understanding of the policy was that if the offender said he was suicidal or you believed the offender to be suicidal, you would move him out of the cell. Scallion did not understand the suicide intervention policy to require that if an offender said another offender was suicidal that she should call mental health.

In 2014 Greg Rhodes was working as a Functional Unit Manager at FCC. On October 22, 2014, he worked from 7:30 to 4:00 p.m. Rhodes had contact with Francisco during a hearing when it was decided that Francisco would be released from protective custody. During the hearing, Rhodes recalled that Francisco was calm and "real polite."

The committee that Rhodes was on recommended Francisco be transferred to the SRU Social rehabilitation unit for his mental health needs.

On October 22, 2014, the decision not to place Francisco on suicide watch came after Rhodes checked with the other case managers and Scallion. Rhodes believed that Scallion would have placed Mr. Francisco on suicide watch if she had

9

any inkling at all that he was suicidal because she knew the offenders really well. Rhodes did not believe that Mr. Francisco was going to commit suicide. Rhodes reviewed the video of the cell search with Miss White. Rhodes had Miss White watch the video with him so they could both make sure that they did not see anything coming out of the cell. "I didn't want to miss anything." No noose was seen in the cell and no staff reported seeing a noose in Francisco's cell. Rhodes concluded after talking with the two case managers that all they had was a false report of a noose being taken out of the cell. Rhodes asked Kim Scallion if she had anything else and she did not. Rhodes believed that the statement by Francisco's cellmate that Francisco was suicidal was a ploy to get Francisco out of the cell or get the cellmate out of the cell. Rhodes believed that the cellmate "just wanted to get rid of his cellmate." Rhodes believed that staff had checked on Mr. Francisco and didn't see anything wrong with Francisco. Rhodes believed that an offender made a false statement to get another offender moved.

## Discussion

Plaintiffs assert that the Defendants' conduct amounted to deliberate indifference to Francisco's serious medical needs in violation of the Eighth

10

Amendment. Defendants argue that they are entitled to qualified immunity because no evidence exists to support the claim that they were deliberately indifferent.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To prevail against a claim of qualified immunity, a plaintiff must show (1) that the facts alleged or shown by the plaintiff make out a constitutional violation, and (2) that the constitutional right allegedly violated was 'clearly established.' " *Swearingen v. Judd*, 930 F.3d 983, 987 (8th Cir. 2019) (quoting *Pearson*, 555 U.S. at 232). The Court may address either question first. *Pearson*, 555 U.S. at 236.

The Eighth Amendment requires prison officials to provide inmates with medical care. *Laughlin v. Schriro*, 430 F.3d 927, 928 (8th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (internal citations and quotations omitted).

"A plaintiff claiming deliberate indifference must establish objective and subjective components." *Thompson v. King*, 730 F.3d 742, 746 (8th Cir. 2013)

11

(citing *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009)). "The objective component requires a plaintiff to demonstrate an objectively serious medical need," while "[t]he subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." *Id.* (citing *McRaven*, 577 F.3d at 980). "Deliberate indifference is 'akin to criminal recklessness,' something more than mere negligence; a plaintiff must show that a prison official 'actually knew that the inmate faced a substantial risk of serious harm' and did not respond reasonably to that risk." *A.H. v. St. Louis County*, 891 F.3d 721, 726 (8th Cir. 2018) (quoting *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

The Eighth Circuit has recognized that a risk of suicide by an inmate is a serious medical need. *See Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000) (citing *Rellergert v. Cape Girardeau County*, 924 F.2d 794 (8th Cir. 1991)). Defendants do not dispute that risk of suicide is a serious medical need.

To establish the subjective component of his deliberate-indifference claim, Plaintiffs must demonstrate that the Defendants " 'actually knew that [Joshua] faced a substantial risk of serious harm' and did not respond reasonably to that risk." *See A.H.*, 891 F.3d at 726 (quoting *Drake*, 445 F.3d at 1042); *cf. Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012) ("In the jail suicide context, qualified immunity is appropriate when a plaintiff 'has failed to show ... that his

12

jailers have acted in deliberate indifference to the risk of his suicide.' " (quoting *Rellergert*, 924 F.2d at 796)).

"[W]here suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk." *A.H.*, 891 F.3d at 727 (quoting *Rellergert*, 924 F.2d at 796). The Court "must objectively 'consider[ ] the measures taken in light of the practical limitations on jailers to prevent inmate suicides.' " *Luckert*, 684 F.3d at 818 (alterations in original) (quoting *Rellergert*, 924 F.2d at 796).

Deliberate indifference is a rigorous standard, "akin to criminal recklessness, something more than mere negligence; a plaintiff must show that a prison official actually knew that the inmate faced a substantial risk of serious harm and did not respond reasonably to that risk." *A.H.*, 891 F.3d at 726. It requires "a showing that the official was subjectively aware of the risk." *Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2021), citing, *Farmer v. Brennan*, 511 U.S. 825, 829 (1994).

> When the claim is that "jailers fail[ed] to discover the decedent's suicidal tendencies," as in this case, the issue is whether a defendant "possess[ed] the level of knowledge that would alert him to a strong likelihood that [the decedent] would attempt suicide." *Bell v. Stigers*, 937 F.2d 1340, 1343-44 (8th Cir. 1991) (cleaned up), overruled on other grounds by *Farmer*, 511 U.S. at 829, 114 S.Ct. 1970. A showing of negligence is insufficient. See *Lambert v. City of Dumas*, 187 F.3d 931, 937 (8th Cir. 1999). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838, 114 S.Ct. 1970.

13

*Leftwich Trustee of Statutory Class of Next of Kin to Leftwich v. Cnty. of Dakota*, 9 F.4th 966, 972–73 (8th Cir. 2021).

The evidence in the record establishes that Defendants did not merely ignore the notification by Francisco's cellmate that he "was suicidal." They proceeded to inquire from Francisco to ascertain whether the cellmate's claim was not merely an attempt to have Francisco removed from the cell. Francisco was questioned by Defendants, and it appeared to them that he was not at that time contemplating suicide. The cell was searched, and the video of the search was reviewed by not only Defendant Rhodes, but another facility employee to make sure nothing was missed. None of the defendants actually knew

No reasonable jury could find that Defendants knew or must have known that there was a substantial risk. Each Defendant took steps they believed were proper to ascertain whether a risk existed. There is absolutely no evidence that any defendant was aware of Francisco's intent to commit suicide and thereafter deliberately did nothing to prevent it. Indeed, the medical staff ascertained Francisco should not be placed on a suicide watch. "Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis. . ." *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011).

**Conclusion**

Based on the foregoing analysis, Defendants are entitled to qualified immunity on the claims against them, and therefore, summary judgment is proper.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Rhodes, England, Griffin, and Scallion's Motion for Summary Judgment [Doc. No. 98], is **Granted**.

A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 27th day of December, 2022.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE